**Opinion issued July 21, 2026**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-24-00587-CV

————————————

**JOHN R. "JACK" CHRISTIE, Appellant**

**V.**

**BEATRICE A. HEITMANN, Appellee**

---

**On Appeal from the 434th District Court**
**Fort Bend County, Texas**
**Trial Court Case No. 16-DCV-231515**

---

## MEMORANDUM OPINION

This case involves a contract dispute stemming from the sale of property by Appellant John R. "Jack" Christie to Appellee Beatrice A. Heitmann and her subsequent sale of the property to a third party. Christie sued Heitmann for breach of contract and fraud, claiming Heitmann owed him money from the subsequent

sale of the property. The case proceeded to trial and the jury returned a verdict in favor of Heitmann, rejecting Christie's claims.

In three issues, Christie argues (1) there is insufficient evidence to support the jury's finding that Heitmann did not breach her contract with him, (2) there is insufficient evidence to support the jury's finding that Heitmann did not commit fraud, and (3) Heitmann's counsel's argument to the jury on how it should answer the jury questions constituted reversible error.

We affirm the trial court's judgment.

## Background

In 2011, Heitmann purchased real property and a storage business on the property (the "Property") from Christie for $2.2 million. At Christie's suggestion, Heitmann and Christie executed two promissory notes for purchase of the Property. The first note, signed on June 1, 2011, was for $1,641,000 ("First Note") and was secured by a deed of trust. It was filed in the Fort Bend County Real Property Records. The second note, which was unsecured, was signed on June 15, 2011, and was for $289,000 ("Second Note").[1] The Second Note provided:

> The full purchase price of the property is $2.2 million. The amount of $150,000.00 was paid to the Lender [Christie] in cash as a down payment plus $70,000.00 in checks in the Contract for Deed. This left a balance of $289,000 as a personal loan plus $1,691,000.00 as a

---

[1] As set forth in the text of the Second Note, the promissory notes plus $220,000 in cash and checks remitted to Christie totaled $2.2 million.

2

Promissory Note which equals $1,980,000.00. This amount is shown on the Loan Amortization Schedule.

The note shall be fully paid on 5/30/2031 or before, on the sale of the property.

Upon the sale of the property, the lender of this note will receive an additional amount up to $800,000.00 if sold for $3.8 million. If the property sells for more than $3.8 million, the lender gets an extra 25% of the profit for the first eight years; then the 25% will be reduced by 5% for each year thereafter.[2]

If the property sells for less than $3.8 million, the profit will be split 50-50%.

. . .

This note may be prepaid at any time without notice, in whole or in part, and without incurring any penalty or bonus.

Heitmann testified that she paid interest at the rate of 6.7 percent on her loan from Christie for the Property's purchase.[3]

When Heitmann purchased the Property, she purchased both the real property and a mini-storage business on it. Eventually, she and her husband added a business called Trailer World and RV Park ("Trailer World") to the Property.

In 2013, Heitmann decided to refinance the Property. She testified that she decided to refinance partly because she was able to obtain a lower interest rate

---

[2] Heitmann refers to this paragraph as the "bonus provision" and for consistency's sake, so do we.

[3] The First Note identified an annual interest rate of 9.18 percent. The Second Note did not identify an interest rate. Both notes were twenty-year notes that would have matured on May 30, 2031.

from the bank, and partly so she could pay off Christie and eliminate the bonus provision in the Second Note. At Heitmann's request, Christie faxed her a payoff amount for the two notes dated June 27, 2013. The handwritten, signed payoff notice—which was on Christie's chiropractic office letterhead—stated that the "June 28th payoff balance" was $1,879,076.81 in principal and $10,516.52 in interest. In 2013, Heitmann paid Christie the amount she owed according to his handwritten note and he accepted the payment.

In 2014, Heitmann and her husband became interested in selling the Property and Trailer World. During that time, she learned that Christie had placed a lien on the Property, even though he had been paid the outstanding amounts on the notes. Heitmann hired counsel and filed a lawsuit to secure removal of the lien from the Property.

In 2014, BJ Prendergast became interested in purchasing the Property and Trailer World. A few years later, in 2017, BJ Prendergast negotiated with Heitmann a purchase price of $1.8 million for the real property,[4] $2.4 million for the trailer business, and $800,000 for the storage business. The purchase closed in 2020. Although Heitmann believed her debt to Christie had been paid in full, Christie claimed he was entitled to a bonus stemming from the sale to BJ Prendergast because the total purchase price for the Property was for a sum greater

_____

[4] The Fort Bend County tax appraisal on the Property and improvements in 2017 was $1,768,200.

than $3.8 million. Christie filed a counterclaim against Heitman for breach of contract claiming she failed to pay him the bonus contemplated in the Second Note after selling the Property and Trailer World to BJ Prendergast.[5] He also asserted a claim for fraud alleging Heitmann had entered into the Second Note with the intent to defraud Christie because she "had no intention of honoring the obligations of the Second Note, despite her representations she would do so."

Trial ensued on Christie's breach of contract and fraud counterclaims.[6] Heitmann, BJ Prendergast, and Christie testified live, and an appraisal expert testified for Christie by deposition. The trial court granted a directed verdict on the fraudulent inducement claim in Heitmann's favor, leaving only the breach of contract and common law fraud claims for the jury to decide.

## Jury Charge

The jury charge gave the jury two instructions. First, it instructed the jury that "The 'Agreement' at issue [was] the $289,000.00 Promissory Note dated June 15, 2011 between Plaintiff and Defendant." Second, the jury was instructed that "'Misrepresentation' means a false statement of fact."

---

[5]    Christie testified at trial that he is entitled to $1.1 million as a result of Heitmann's sale of the Property. That sum comprises $800,000 because the sale price exceeded $3.8 million, plus an additional $300,000 that represents 25 percent of the $1.2 million by which the sale price exceeded the $3.8 million threshold mentioned in the Second Note.

[6]    The counterclaims were for breach of contract, common law fraud, and fraudulent inducement. Heitmann's only claim pertained to the lien, which was resolved by partial summary judgment.

The jury was asked to answer five questions: (1) Did Heitmann fail to comply with the terms of the Agreement? (2) If yes, was Heitmann excused from failure to comply with the Agreement? (3) If yes to question 1 and no to question 2, what sum of money, if any, if paid now in cash, would fairly and reasonably compensate Christie for his damages resulting from Heitmann's failure to comply? (4) Did Heitmann commit fraud against Christie? and (5) If yes, what sum of money, if paid now in cash, would compensate Christie for his damages, if any, resulting from such fraud**?** In a unanimous verdict, the jury found in favor of Heitmann on Christie's breach of contract and fraud claims. The trial court entered judgment on the jury's verdict. This appeal ensued.

### Sufficiency of the Evidence

In his first two issues, Christie argues there is factually insufficient evidence to support the jury's finding that Heitmann did not breach the Second Note and that Heitmann did not commit fraud.[7]

When reviewing a factual sufficiency challenge, we must consider and weigh all of the evidence, both for and against the finding. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). Our review of the evidence must be

---

[7] In his stated issues, Christie argues there is "insufficient evidence" to support the jury's verdict on the contract and fraud claims. But in the section of his brief titled "Arguments and Authority" he sets forth the standard of review for factual sufficiency only. We thus limit our review to the factual sufficiency of the jury's verdict.

conducted in a neutral light. *Altice v. Hernandez*, 668 S.W.3d 399, 410 (Tex. App.—Houston [1st Dist.] 2022, no pet.). When a party attacks the factual sufficiency of an adverse finding on an issue for which it had the burden of proof, he must demonstrate on appeal that "the adverse finding is against the great weight and preponderance of the evidence." *Dow Chem. Co.*, 46 S.W.3d at 242; *Capcor at KirbyMain, L.L.C. v. Moody Nat'l Kirby Houston S, L.L.C.*, 509 S.W.3d 379, 384 (Tex. App.—Houston [1st Dist.] 2014, no pet.). We will set aside the verdict only if the evidence in support of the finding is so weak as to render the verdict clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Trimcos, LLC v. Aquatic Sols. of Tex.*, No. 01-23-00955-CV, 2025 WL 2393909, at *2 (Tex. App.—Houston [1st Dist.] Aug. 19, 2025, no pet.) (mem. op.).

In conducting our review, we may not substitute our judgment for that of the jury. The jury is the "sole judge of the credibility of witnesses and the weight to be given to their testimony." *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). As the sole judge of witnesses' credibility, the jury may give credence to one witness and disbelieve another. *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005).

## Breach of Contract

To prevail on his breach of contract claim, Christie had to establish (1) the existence of a valid contract; (2) that he tendered performance or was excused from

doing so; (3) that Heitmann breached the terms of the contract; and (4) that he sustained damages as a result. *Foster v. Nat'l Collegiate Student Loan Tr. 2007-4*, No. 01-17-00253-CV, 2018 WL 1095760, at *9 (Tex. App.—Houston [1st Dist.] Mar. 1, 2018, no pet.) (mem. op.) (citing *West v. Triple B Servs., LLP*, 264 S.W.3d 440, 446 (Tex. App.–Houston [14th Dist.] 2008, no pet.)).[8]

In response to Question No. 1, the jury found that Heitmann did not breach the terms of the Second Note—the third element of a claim for breach of contract—and it therefore did not reach Question No. 3 regarding damages. Christie argues that "Heitmann agreed to pay [him] a portion of the sales price for the property if it resold for over $2,200,000.000" [sic] and that he "did not release Heitmann from her obligations under the Second Note when he released the first note." He argues that while the jury's role as fact finder "certainly involves weighing the credibility of the witnesses," the issue of whether Heitmann breached the Second Note was not one of credibility. He posits that Heitmann's argument to the jury was that the "payment-upon-sale requirement under the Second Note was a 'bonus' payment that was no longer owed once the note was paid off" and that

---

[8] The elements of a valid contract are: (1) an offer, (2) an acceptance, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Foster v. Nat'l Collegiate Student Loan Tr. 2007-4*, No. 01-17-00253-CV, 2018 WL 1095760, at *9 (Tex. App.—Houston [1st Dist.] Mar. 1, 2018, no pet.) (mem. op.) (citing *Beverick v. Koch Power, Inc.*, 186 S.W.3d 145, 150 (Tex. App.–Houston [1st Dist.] 2005, pet. denied)).

this argument was not contemplated by Jury Question No. 1, which asked whether Heitmann failed to comply with the Second Note's requirements. We disagree.

In the context of contractual interpretation, the jury may resolve questions regarding contract formation—that is, whether the parties agreed to the terms of an agreement. *See Foreca, S.A., v. GRD Dev. Co. Inc.*, 758 S.W.2d 744, 745–46 (Tex. 1988) (whether parties intended to execute binding contract often question for factfinder) (citations omitted). "When a court determines that a contract is ambiguous, the meaning becomes a fact issue for the jury and extraneous evidence may be admitted to help determine the language's meaning." *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 480 (Tex. 2019) (citing *Italian Cowboy Partners, Ltd. v. Prudential Ins. of Am.*, 341 S.W.3d 323, 333–34 (Tex. 2011)). A contract is ambiguous if it "contains two or more reasonable interpretations." *Id.* at 479 (citing *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 806 (Tex. 2012)). While the trial court did not make an express finding that the Second Note was ambiguous, the submission of questions to the jury on the issue of breach and damages required the jury to determine which of the parties' competing interpretations of the Second Note the parties intended. *See Exxon Corp. v. W. Tex. Gathering Co.*, 868 S.W.2d 299, 302 (Tex. 1993) ("While the trial court here never made an express finding that the contract was ambiguous, such a determination was necessary to its submission of a jury question

inquiring into the amount of WTG's take-or-pay liability, which required *the jury* to determine on the basis of extrinsic evidence which of the interpretations of the take-or-pay provision the parties intended.") (emphasis in original) (citing *Neece v. A.A.A. Realty Co.*, 159 Tex. 403, 322 S.W.2d 597, 599 (1959) (holding that in submitting issues to jury in order to ascertain parties' agreement, "the trial judge evidently considered that the written instrument was ambiguous")); *see also Sifuentes v. Carrillo*, 982 S.W.2d 500, 504 (Tex. App.—San Antonio 1998, pet. denied) ("In the absence of an express finding of ambiguity, the trial judge's submission of a jury question on a contract raises the inference that the trial court found the contract to be ambiguous.") (citing *Exxon Corp.*, 868 S.W.2d at 302). If the trial court had not considered the contract ambiguous, it "could only have interpreted it as a matter of law." *Exxon Corp.*, 868 S.W.2d at 302.[9, 10]

Contrary to Christie's argument on appeal, there was a dispute as to whether Heitmann had any remaining obligations to Christie under the Second Note after

---

[9] "A contract is not ambiguous if it can be given a definite or certain meaning as a matter of law." *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996) (citations omitted). If a contract is unambiguous, "*the courts* will give effect to the intention of the parties as expressed or as is apparent in the writing." *Exxon Corp. v. W. Tex. Gathering Co.*, 868 S.W.2d 299, 302 (Tex. 1993) (emphasis in original) (quoting *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981)).

[10] It is not clear from the appellate record whether Heitmann's motion for summary judgment—which resulted in the trial court's finding that there was not a lien on the Property—sought relief on any of Christie's counterclaims. The partial summary judgment order indicates that the motion was granted in part and denied in part, but the summary judgment pleadings are not in the appellate record.

repayment—indeed, that was the crux of the case. The jury was faced with two competing theories as to the meaning of the bonus language in the Second Note and the sentence about prepayment "without incurring any penalty or bonus." According to Christie, Heitmann did "not dispute that the Second Note required her to pay Christie upon resale of the property." Rather, she argued at trial that she "should not have had to comply with that requirement because Christie's acceptance of the loan repayment somehow invalidated his right to recover proceeds-based payment upon a subsequent sale." But that is not what Heitmann testified.

Heitmann testified that there was no language in the Second Note indicating that Christie would be entitled to a bonus if a sale occurred after he was paid. Heitmann testified that the only part of the Second Note that contemplated a bonus referred to money Christie would get if she sold the Property before Christie was repaid. According to Heitmann, when she negotiated the Second Note, she understood that if she paid Christie off before the notes matured, she would not owe him anything else—hence, the language in the Second Note about prepayment "without incurring any penalty or bonus." Heitmann testified there was nothing in the Second Note that could have been construed as requiring a "bonus" beyond the amount to be paid if the Property was sold for $3.8 million or more after the notes were paid off. She testified she "definitely [would] not" have agreed to the Second

Note if she thought she would owe additional money to Christie after paying off the notes.

Heitmann testified that she told Christie by text that she was going to pay him in full on both notes. He called her afterward and asked, "Is the paragraph still in effect?" And when she said "no," he hung up on her. Heitmann testified that there is no language in the Second Note that states the bonus survives the payoff of the note: "If I pay him off, it's paid." Heitmann testified that she declined to sign a document prepared by Christie that would have expressly required her to agree that the bonus provision of the Second Note would remain in effect after the Second Note was paid.[11]

The jury thus heard conflicting testimony from Heitmann and Christie and examined the Second Note and the exhibit regarding Christie's failed attempt to have Heitmann execute an acknowledgement about the bonus surviving any prepayment. The jury was free to make a credibility finding as to whether to believe Heitmann or Christie, whose theories as to the meaning of the prepayment language were mutually exclusive. *See Allstate Tex. Lloyds v. Mason*, 123 S.W.3d

---

[11] Christie argues in his appellate brief that the exhibit reflecting his attempt to have Heitmann sign a document acknowledging the bonus provision would "remain[] in full force and effect after the payment" of the Second Note was "not proper for the jury's consideration under the parol evidence rule." However, Christie did not object to the admission of the exhibit during trial. As such, he is precluded from objecting to the evidence on appeal. *Eaves v. Unifund CCR Partners*, 301 S.W.3d 402, 405 (Tex. App.—El Paso 2009, no pet.) (citing cases holding parol evidence objection not preserved when raised for first time on appeal).

690, 703 (Tex. App.—Fort Worth 2003, no pet.) ("With competing contentions supported by expert witnesses on both sides, the burden fell on the jury to determine which contention was more credible.") (citing *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 134 (Tex. 2000) ("Under established Texas jurisprudence, a reviewing court must defer to the fact-finder's credibility determinations because the jury is the exclusive judge of the facts, the witnesses' credibility, and the weight given to their testimony.") (Baker, J., concurring in part and dissenting in part).

Having reviewed the evidence in support of both theories in a neutral light, we conclude that the evidence supporting the jury's determination that Heitmann did not breach the Second Note—presumably because they concluded her prepayment extinguished the bonus language—was not so weak or the evidence to the contrary so overwhelming as to require the jury's answer as to breach of contract to be set aside. Given the parties' testimony and the language of the Second Note, coupled with the other exhibits, we hold there was factually sufficient evidence for the jury to conclude that Heitmann did not breach the terms of the Second Note. We overrule Christie's first issue.

## Fraud

Christie argues in his second issue that Heitmann "acted fraudulently both in her initial execution of the Second Note as well as her subsequent blatant attempts

13

to sidestep her obligations thereunder." He argues that Heitmann knew the Second Note "was designed to protect Christie's investment in the Property, yet Heitmann argued at trial that a simple refinance of the Property was sufficient to erase the Second Note." He argues that to avoid her contractual obligations, Heitmann valued the Property at $1.8 million in her resale despite its actual value of $4.61 million. Thus, he argues, "Heitmann committed a fraudulent breach of contract upon Christie by entering into the Second Note with an escape plan in mind and subsequently manipulating the resale in 2020 in such a way as to ensure she would not have to pay Christie under [the] Second Note."

To prevail on his fraud claim, Christie had to establish that Heitmann made (1) a material misrepresentation, (2) that was either known to be false when made or was asserted without knowledge of its truth, (3) that was intended to be acted upon, (4) that was relied upon, and (5) that caused injury. *Boeing Co. v. Sw. Airlines Pilots Ass'n*, 716 S.W.3d 140, 150 n. 19 (Tex. 2025) (citation omitted).[12]

The jury found that Heitmann did not breach the Second Note by failing to pay Christie a bonus after the sale of the Property to BJ Prendergast. And we have concluded there is factually sufficient evidence supporting the jury's finding on that issue. The fact that the jury found Christie was not entitled to a payment after the sale of the Property negates the injury element of Christie's fraud claim. That

---

[12] The jury charge combined the fourth and fifth fraud elements into a single element.

is, the only "injury" which Christie could have suffered with respect to his fraud claim is Heitmann's failure to pay him a bonus after the sale of the Property to BJ Prendergast. But in finding that Heitmann did not breach the Second Note—even though she did not pay the bonus after the sale of the Property—the jury necessarily found Christie was not entitled to the bonus payment. Thus, the jury implicitly determined that Christie was not injured, negating his fraud claim.

Given the absence of an injury, we conclude there is factually sufficient evidence supporting the jury's finding that Heitmann did not commit fraud. *See Smitherman v. Bank of Am., N.A.*, No. 14-14-00550-CV, 2015 WL 1622180, at *3 n.3 (Tex. App.—Houston [14th Dist.] Apr. 7, 2015, pet. denied) (mem. op.) ("[L]ack of damages or injury would vitiate any claim of fraud."); *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 154 (Tex. 2015) (stating that if damages were not recoverable, "fraud claim would fail for want of an appropriate damages finding"). Christie did not establish that the adverse finding was against the great weight and preponderance of the evidence. *See Dow Chem. Co.*, 46 S.W.3d at 242.[13]

We overrule Christie's second issue.

---

[13] We need not address Christie's argument about the appraisal of the Property because it is based on his theory that he was entitled to the bonus payment. Because the jury found there was no breach, it necessarily found Christie was not entitled to the bonus. Thus, any argument about the amount to which he was entitled—based on his expert's appraisal testimony—is not relevant to our analysis.

**Improper Jury Argument**

In his third issue, Christie argues that Heitmann's counsel "improperly and incurably advised the jury of the effect of answering 'no'" to questions on the jury charge. Specifically, Christie complains of the following comments during Heitmann's counsel's closing argument:

- "You write no in there [to Question No. 1] and you're done. That's all you have to do. No, done. You don't have to answer anything else."

- "But remember, if you say no to Question 1, you don't even have to answer this one. Just write no, and we're out of here[.]"

- "Two no's and you're done. You're absolutely done. Ms. Heitmann is done. This case is done. We can all be done."

- "We are done. We are done. As soon as you finish your deliberations and bring back a 'no' to Question 1, and a 'no' to Question 4."

Christie contends these remarks were an attempt "to have the jury decide the case not based on its merits, but based on their own convenience." Christie did not object to any of these remarks during closing. Heitmann argues that Christie thus failed to preserve this issue for appeal. Christie argues it was not necessary for him to object in the trial court because "the conduct or comment [could not have been] rendered harmless by proper instruction."

"[A] party waives an objection to improper jury argument if he does not object immediately after the contested statement is made or preserve the issue in a motion for new trial." *In re C.H.*, No. 02-13-00312-CV, 2014 WL 3891636, at *1

16

(Tex. App.—Fort Worth Aug. 7, 2014, no pet.) (mem. op.) (citing TEX. R. CIV. P. 324(b)(5)). "To preserve [their] improper-jury-argument complaint for appeal, [the appellants] were required to interpose the same objection in the trial court that they raise here." *Patriot Contracting, LLC v. Shelter Prods., Inc.*, 650 S.W.3d 627, 650 (Tex. App.—Houston [1st Dist.] 2021, pet. denied) (citing TEX. R. APP. P. 33.1(a)). The Texas Supreme Court established a four-pronged analysis regarding the preservation of appeal for improper jury argument. *See Standard Fire Ins. Co. v. Reese,* 584 S.W.2d 835, 839 (Tex. 1979) (stating that to preserve appeal of improper jury argument, appellant must prove "(1) an error (2) that was not invited or provoked, (3) that was preserved by the proper trial predicate, such as an objection, a motion to instruct, or a motion for mistrial, and (4) was not curable by an instruction, a prompt withdrawal of the statement, or a reprimand by the judge") (citing 3 MCDONALD, TEXAS CIVIL PRACTICE § 13.17.2 (1970)).

The only exception to the preservation requirement for jury argument is in those "rare instances [where] the probable harm or prejudice [from the jury argument] cannot be cured." *Living Ctrs. of Tex., Inc. v. Penalver*, 256 S.W.3d 678, 680 (Tex. 2008). The test to determine whether improper jury argument is curable is "whether the argument, considered in its proper setting, was reasonably calculated to cause such prejudice to the opposing litigant that a withdrawal by counsel or an instruction by the court, or both, could not eliminate the probability

17

that it resulted in an improper verdict." *Alonzo v. John*, 689 S.W.3d 911, 913 (Tex. 2024) (quoting *Living Ctrs.*, 256 S.W.3d at 681); *see Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex. 2009) ("A complaint of incurable argument may be asserted and preserved in a motion for new trial, even without a complaint and ruling during the trial.") (citing TEX. R. CIV. P. 324(b)(5)).[14]

Christie stated in his motion for new trial that Heitmann's counsel's argument "was incurable when he informed the jury of the effect of their answers by arguing that *If you answer no to questions 1 and 2, you can go home.*" (Emphasis in original.) Our sister court has addressed and rejected this very issue argument. In *Chatman v. Ferd Staffel Co.*, the appellant objected to a similar jury argument:

> Appellee's counsel, in argument to the jury, stated that since all other issues were conditioned on a negative answer to the first, if the first issue was answered in the affirmative it would not be necessary to answer the rest, "and we can go home." Appellant objected neither to the argument nor the conditional submission. He now says this

---

[14] The Texas Supreme Court has identified examples of the "rare instances" when probable harm or prejudice cannot be cured. For example, "appeals to racial prejudice adversely affect the fairness and equality of justice rendered by courts because they improperly induce consideration of a party's race to be used as a factor in the jury's decision." *Living Ctrs. of Tex., Inc. v. Penalver*, 256 S.W.3d 678, 680 (Tex. 2008) (citing *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 840 (1979)). In addition, "[u]nsupported, extreme, and personal attacks on opposing parties and witnesses can similarly compromise the basic premise that a trial provides impartial, equal justice." *Id.* (citing *Reese*, 584 S.W.3d at 840). And "accusing the opposing party of manipulating a witness, without evidence of witness tampering, can be incurable, harmful argument." *Id.* (citing *Howsley & Jacobs v. Kendall*, 376 S.W.2d 562, 565–66 (Tex. 1964)).

argument was erroneous as improperly informing the jury of the effect of its answers. It told the jury little more than did the court's charge with appellant's acquiescence, and hence was not reversible error.

362 S.W.2d 173, 174 (Tex. App.—Waco 1962, writ ref'd n.r.e.) (citing *Grieger v. Vega*, 153 Tex. 498, 271 S.W.2d 85, 87 (1954)).[15]

As in *Chatman*, not only did Christie's counsel fail to object during the argument, he also acquiesced to the conditional questions in the jury charge. Jury Questions No. 2, No. 3, and No. 5 were predicated on affirmative answers to Questions No. 1 and No. 4. The jury charge also provided the following admonition:

> Do not decide who you think should win before you answer the questions, and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect that your answers will have.

---

[15] The Texas Supreme Court has "recognized that a strict rule against telling the jury the effect of its answers ignores reality in most cases" and limited the rule regarding telling juries the results of their decisions to cases where the effect of answers is not obvious:

> The spirit of our practice of submitting cases on special issues would be violated if jurors were informed either by the court or by counsel of the effect of their answers, but where the effect is so obvious that any juror with ordinary intelligence would know its effect, neither the letter nor the spirit of the rule is violated by a charge which assumes such knowledge.

*H.E. Butt Grocery Co. v. Bilotto*, 985 S.W.2d 22, 26 (Tex. 1998) (quoting *Grieger v. Vega*, 153 Tex. 498, 271 S.W.2d 85, 87 (1954)).

Given this directive and the instructions given in answering Questions No. 2, No. 3, and No. 5, the argument at issue "told the jury little more than did the court's charge[.]" *See Chatman*, 362 S.W.2d at 174.

Assuming without deciding that Christie preserved his issue with respect to the jury argument, we hold that the remarks were not harmful. We overrule Christie's third issue.

### Conclusion

We affirm the trial court's judgment.

Veronica Rivas-Molloy
Justice

Panel consists of Justices Rivas-Molloy, Johnson, and Dokupil.